**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| ABRAHIM FOFANA, | Civil No. 18-3163 (JRT/BRT) |
| Plaintiff, | |
| v. | |
| CHAD WOLF, *in his official capacity as Acting Secretary of the United States Department of Homeland Security*, KENNETH CUCCINELLI, *in his official capacity as Acting Director of the United States Citizenship and Immigration Services*, DONALD NEUFELD, *in his official capacity as Associate Director, Service Center Operations, United States Citizenship and Immigration Services*, LESLIE TRITTEN, *in her official capacity as Field Office Director, Minneapolis-Saint Paul Field Office, United States Citizenship and Immigration Services*, and UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, | **MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

---

David Wilson, Brittany Bakken, and Matthew Lawlyes, **WILSON LAW GROUP**, 3019 Minnehaha Avenue, Suite 200, Minneapolis, MN 55406 for plaintiff.

Joseph F. Carilli, Jr., **OFFICE OF IMMIGRATION LITIGATION, UNITED STATES DEPARTMENT OF JUSTICE**, Post Office Box 868, Ben Franklin Station, Washington, DC 20044, for defendants.

This case requires the Court to determine two questions: (1) whether preclusion rules apply when an alien who has been granted asylum in the United States applies for a green card; and, if so, (2) whether the Government is precluded from finding Plaintiff is

ineligible for a green card based solely on the same facts on which Plaintiff's asylum application was granted. Because the Court has determined both that preclusion rules do apply and that the Government cannot relitigate the question of Plaintiff's admissibility, the Court will grant Plaintiff's Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment.

## BACKGROUND

Abrahim Fofana is a citizen and native of Liberia. (Compl. ¶ 17, Nov. 12, 2018, Docket No. 1.) In September 1989, when he was sixteen years old, Fofana moved to Saudi Arabia to study Islam. (Cert. Admin. Record ("CAR Part 1") at 21, ¶ 3, Apr. 5, 2019, Docket No. 18). Charles Taylor invaded Liberia on December 24, 1989, with the National Patriotic Front of Liberia (the "NPFL"). (*Id.* at 21; 40.) The United Liberation Movement for Democracy in Liberia ("ULIMO") formed in response soon after, and Fofana believed that the peacekeeping force sent into Liberia by the Economic Community of West African States supported ULIMO. (*Id*. at 21, 40.)

While studying in Saudi Arabia, Fofana joined the Liberian Student Organization (the "LSO"), which solicited funds from Saudi citizens to support ULIMO in Liberia. (*Id.* at 22, ¶ 6.) This fundraising continued from around 1991 until 1996. (*Id.* at 22, ¶ 7.) Fofana did not directly handle money, speak to donors, or personally deliver money to Liberia; instead, he was a member of the LSO who agreed with ULIMO's publicly stated goals to end the conflict and prevent civilian deaths in Liberia. (*Id*.)

In August 1996, Fofana returned to Liberia, through its border with Guinea. (*Id.* at 22–23, ¶ 8.) ULIMO soldiers helped Fofana cross into the country after learning he was

an LSO member.  (*Id.*)  Shortly after crossing the border, Fofana was captured by the NPFL.  (*Id.* at 23, ¶ 10.)  He escaped two days later and decided to leave Liberia, again across the Guinean border, during which time he was protected by ULIMO soldiers.  (*Id.*)

Afterward, Fofana briefly returned to Saudi Arabia before traveling to Malaysia, where he studied and earned a law degree.  (*Id.*; Supp. to Cert. Admin. Record ("Supp. CAR") at 19, May 15, 2019, Docket No. 21.)  Throughout this period, Fofana avers that he believed ULIMO had international support, including from other West African governments; this only changed after he heard reports, brought forward during Liberia's truth-and-reconciliation inquiry established after the civil war, that ULIMO had harmed civilians during the conflict.  (CAR Part 1 at 23–24, ¶¶ 10–11.)

Fofana arrived in the United States on January 28, 2001 and applied for asylum at the Minneapolis–Saint Paul airport.  (Compl. ¶ 32.)  Because he admitted to using fraudulent documents to enter the country, he was found to be inadmissible under the Immigration and Naturalization Act ("INA") for, respectively, fraud or willful representation and being an immigrant without a proper visa or travel document.  (Cert. Admin. Record Part 4 ("CAR Part 4") at 23–24, Apr. 5, 2019, Docket No. 18-3.)  He was detained while awaiting his credible-fear interview and his removal hearing.  (*Id.* at 23, 26.)

After his entry into the United States, Fofana applied for asylum.  (Compl. ¶ 35.)  On his asylum application form, Fofana stated that he and his family had been mistreated or threatened by government authorities, namely that: (1) the NPFL displaced his family; (2) the NPFL killed his father and brother; (3) the NPFL detained and beat him when he

attempted to return to Liberia; and (4) that he and his family were persecuted for being Mandingo and Muslim. (CAR Part 4 at 6–7.) He also stated that he "openly supported the ULIMO in their opposition to [Charles Taylor and the NPFL] during the war by raising funds for the[ir] operations . . . [and] challenged [the Taylor] government's policies while I was a student in Malaysia. (*Id.* at 6.) In total, Fofana acknowledged that he was active supporter of ULIMO six times in his asylum application. (*Id.* at 6–8.) He also acknowledged that support three more times in his accompanying affidavit. (*Id.* at 13, 16, ¶¶ 14, 18, 39.)

On March 1, 2001, Fofana appeared before an immigration judge ("IJ") in Bloomington for an initial removal hearing. (Supp. CAR at 6.) Fofana admitted to using fraudulent documents to enter the United States but sought relief in the form of asylum, withholding of removal, or withholding of removal under Article 3 of the Convention Against Torture. (*Id.* at 7–8, 12.)

On direct examination, Fofana testified that he was both Muslim and a member of the Mandingo people and, as a result, was targeted by Liberian governmental authorities under Taylor. (*Id.* at 19, 34.) Fofana's attorney then inquired into Fofana's activities with any organizations while living in Saudi Arabia. (*Id.* at 34–35.) Fofana answered that he was part of the LSO, of which there were 25 to 30 Mandingo Muslim members, and that he served as assistant secretary in the Medina region. (*Id.* at 35–36.) While a member, Fofana stated that the LSO helped raise money for ULIMO[1] to protect fellow Muslims in

---

[1] The hearing transcript reads "Ulema." This appears to be a transcription error, and the parties agree that the transcript should instead read "ULIMO."

Liberia.  (*Id.* at 36–37.)  Fofana's attorney asked why the LSO supported ULIMO and not another group.  (*Id.* at 37.)  Fofana replied that ULIMO was comprised of and protected Mandingo Muslims.  (*Id.*)

The direct examination turned next to Fofana's return to Liberia in 1996.  He travelled through Guinea and crossed into Liberia with help from ULIMO, which controlled the area.  (*Id.* at 41.)  Because Fofana wanted to travel to the capital, Monrovia, which ULIMO did not control, he had to travel onward alone.  (*Id.* at 42.)  He was subsequently detained by the NPFL,[2] who beat him and did not feed or give him water for two days.  (*Id.* at 42, 46.)  He managed to escape on the second night, once the NPFL soldiers were intoxicated and distracted, and he found refuge in a ULIMO-controlled area of the country.  (*Id.* at 46–47.)  Fofana then testified that he returned to Saudi Arabia for a month before moving to Malaysia.  (*Id.* at 49.)

The direct examination then covered Fofana's student activities while in Malaysia. He testified that he was president of the Liberia Students Association, which had 10 to 20 members, and that his duties consisted of speaking about the civil war in Liberia.  (*Id.* at 51–52.)  During one event, he confronted a visiting Liberian minister by challenging the government's actions during the civil war, for which he was publicly rebuked, which he perceived as a threat.  (*Id.* at 53–55.)

The direct examination lastly focused on Fofana's unsuccessful attempts to secure visas in both the United States and Italy, and the steps he took to acquire fraudulent

---

[2] The hearing transcript reads "MPFO."  This appears to be a transcription error, and the parties agree that the transcript should instead read "NPFL."

documents instead.  (*Id.* at 59–64.)  He was aided in procuring the fake documents by his former brother-in-law, who secured them for free and also gave Fofana approximately $1600 as an informal loan.  (*Id.* at 61–62.)  Fofana concluded by testifying that he would likely be arrested, detained, tortured, or killed by government forces if he returned to Liberia.  (*Id.* at 65.)

Cross-examination by the United States focused solely on: (1) Fofana's knowledge of what happened to his family while he was living outside of Liberia; (2) where and when other family members had traveled to the United States; (3) his detention by the NFPL in Liberia; and (3) how he managed to return to Saudi Arabia afterward.  (*Id.* at 66–78, 80–84.)

The IJ then inquired further into whether Fofana's family members were associated with any military groups in Liberia.  (*Id.* at 85–86.)  Fofana answered that a cousin may have served in the Armed Forces of Liberia under then–President Samuel Doe at the outset of the civil war.  (*Id.*)  The inquiry then turned to Fofana's fundraising to support ULIMO, and the IJ asked about: (1) the specific years Fofana raised money for ULIMO; (2) the name of ULIMO's leader; and (3) the particular faction of ULIMO to which funds were directed.  (*Id.* at 86–87.)

At the close of the hearing, the United States stated that it would not oppose the IJ granting asylum to Fofana, and the IJ did so.  (*Id.* at 89.)  As a result, the IJ did not need to decide Fofana's application for withholding of removal or for withholding of removal under Article 3 of the Convention Against Torture.  (Cert. Admin. Record Part 3 ("CAR Part 3") at 7, Apr. 5, 2019, Docket No. 18‑2.)

Following the mandatory one-year waiting period after becoming an asylee, Fofana filed an application to adjust his status to that of legal permanent resident ("LPR"), with the United States Citizenship and Immigration Services ("USCIS") on July 22, 2002. (Compl. ¶ 38; CAR Part 1 at 3.) In August 2005, USCIS requested evidence from Fofana related to his medical history, immunization history, and biography. (Compl. ¶ 39.) USCIS did not request any evidence concerning Fofana's association with either the LSO or ULIMO. (Compl. ¶ 39.) Fofana sent the requested information to USCIS on October 29, 2005. (Cert. Admin. Record Part 2 ("CAR Part 2") at 24, Apr. 5, 2019, Docket No. 18-1.)

More than twelve years later, USCIS had not yet rendered a decision on Fofana's LPR application, so he filed a mandamus action to compel one on November 11, 2017. (Comp. ¶ 42; *Fofana v. Sessions et al.*, Civil No. 17-5114 (DWF/TNL).) While the mandamus action was pending, USCIS issued a Notice of Intent to Deny ("NOID") on January 3, 2018. (CAR Part 1 at 11–13.) The NOID was based on a preliminarily determination by USCIS that Fofana was not admissible because he had engaged in terrorist activity by supporting ULIMO and that a waiver of inadmissibility was not available to him because terrorist activity was at issue. (*Id.*)

To support this decision, USCIS first determined that ULIMO's violent activities during the Liberian civil war qualified as terrorist activities, as defined by the INA, because they involved gross violations of human rights, war crimes, and crimes against humanity. (*Id.* at 12.) Further, USCIS determined that Fofana's fundraising while a member of the LSO qualified as engaging in terrorist activity under the INA because he had solicited funds

for a qualifying terrorist organization.  (*Id.* at 12–13.)  USCIS pointed to statements made by Fofana in his asylum application and accompanying affidavit, in which he stated that he (1) openly supported ULIMO by raising funds for its operations while in Saudi Arabia; (2) was an active supporter of ULIMO; (3) was an assistant secretary to the LSO, which helped raise money for ULIMO; and (4) was assisted in reentering Liberia in August 1996 by ULIMO because of his earlier fundraising activities.  (*Id.* at 12.)

Based on its determination that Fofana had engaged in terrorist activity in support of a terrorist organization, USCIS determined Fofana was inadmissible under the INA and therefore ineligible to have his status adjusted to LPR.  (*Id.*)  USCIS gave Fofana thirty-three days to respond to the NOID.  (*Id.* at 13.)

Fofana responded on January 29, 2018.  (*Id.* at 14.)  Principally, he argued that he should have been presented with a request for terrorism-related evidence by USCIS before it decided to issue the NOID, which would have allowed Fofana to demonstrate that he did not know or should not reasonably have known that ULIMO was a terrorist organization, as allowed by the INA.  (*Id.* at 15.)  He also (1) objected to both the characterization of ULIMO as a terrorist organization and the suggestion that he personally solicited funds for ULIMO; and (2) argued that even if he were to be found inadmissible, a waiver of inadmissibility was still possible.  (*Id.* at 15–20.)

On June 5, 2018, USCIS denied Fofana's LPR application.  (*Id.* at 3–6.)  It determined that Fofana's statements failed to provide the clear and convincing evidence that he did not know or should not have known that ULIMO was a terrorist organization.

(*Id.* at 5.)  It also determined that the Secretary of Homeland Security's waiver authority did not apply to Fofana's terrorism-related inadmissibility grounds.  (*Id.*)

On November 12, 2018, Fofana filed this action, which alleges that USCIS violated the Administrative Procedure Act and seeks declaratory judgment that (1) USCIS is collaterally estopped from asserting that Fofana is inadmissible based solely on evidence from his asylum application and affidavit; and (2) that Fofana did not engage in terrorist activity.  (Compl. ¶¶ 56–71.)  On June 21, 2019, Fofana filed a motion for summary judgment.  (Pl.'s Mot. for Summ. J., June 21, 2019, Docket No. 23.)  On July 12, 2019, USCIS filed a cross-motion for summary judgment.  (Def.'s Mot. for Summ. J., July 12, 2019, Docket No. 27.)

## DISCUSSION

## I.      STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Review of executive branch agency decisions is governed by the Administrative Procedure Act ("APA"). The Court must set aside any action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law" or that is made "without observance of [the] procedure required by law." 5 U.S.C. §§ 706(2)(A), (2)(D) (2018). Review of agency actions is deferential, with a presumption that the action is valid. *Estate of United Shipping Co. v. General Mills, Inc.*, 34 F.3d 1383, 1390 (8th Cir. 1994). Although "substantial deference" is given to interpretations of statutes and regulations administered by the agency under review, conclusions of law made by agencies are reviewed de novo. *Ramirez-Peyro v. Holder*, 574 F.3d 893, 899 (8th Cir. 2009).

## II.     THE IMMIGRATION AND NATURALIZATION ACT

Any alien physically present in the United States may apply for asylum, regardless of their immigration status. 8 U.S.C. § 1158(a) (2018). The application may be granted if either the Secretary of Homeland Security or the Attorney General determines that the alien is a refugee. *Id.* § 1158(b)(1)(A). An alien may be a refugee if they have a "well-founded fear of persecution" because of one of five categories: "race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A). If an alien's application for asylum is granted, the asylee may, after one year, apply to adjust their status to legal permanent resident ("LPR"). *Id.* § 1159(b). The Secretary of Homeland Security or the Attorney General may grant the adjustment-of-status application so long as the asylee remains a refugee and is "admissible . . . as an immigrant . . . at the time of examination for adjustment . . . ." *Id.* § 1159(b)(5).

Even if an alien is a found to be a refugee, an IJ cannot grant the application for asylum of several classes of aliens. *Id.* § 1158(b)(2)(A) (listing various exceptions to the process for granting asylum applications). Among the exceptions are aliens determined to be inadmissible[3] for engaging in terrorist activities. *Id.* § 1158(b)(2)(A)(v). Likewise, the Government may deny the adjustment-of-status application of an asylee if they are found inadmissible "at the time of examination for adjustment." *Id.* § 1159(b)(5).

An alien who "has engaged in a terrorist activity" is inadmissible. *Id.* § 1182(a)(3)(B)(i)(I). The INA defines "engage in terrorist activity" as, *inter alia*, soliciting funds for a terrorist organization. *Id.* § 1182(a)(3)(B)(iv)(IV). Under the INA there are three "tiers" of terrorist organizations: (1) Foreign terrorist organizations ("FTOs"), which must be designated by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, pursuant to 8 U.S.C. § 1189(a); (2) Terrorist exclusion list (TEL) designated organizations, which are designated "by the Secretary of State in consultation with, or upon the request of, the Attorney General or the Secretary of Homeland Security"; and (3) So-called undesignated or tier III organizations—"group[s] of two or more . . . whether organized or not" that do not appear on any government list but engage in terrorist activities. *Id.* § 1182(a)(3)(B)(vi).

---

[3] Congress has created an extensive list of "classes of aliens ineligible for visas or admission." 8 U.S.C. § 1182(a) (2018). Where many provisions of the INA require aliens to be admissible in order to qualify for immigration programs, the statute references only those classes of aliens who are *in*admissible.

# III.    ANALYSIS

The only question at issue on these cross-motions for summary judgment is whether the decision of the IJ to grant Fofana's asylum application in March 2001 means that USCIS is collaterally estopped from denying, based on the same record from the 2001 decision, Fofana's LPR application on terrorism-inadmissibility grounds in 2018.

"Under the doctrine of collateral estoppel, also called issue preclusion, '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.'" *Turner v. U.S. Dep't of Justice*, 815 F.3d 1108, 1111 (8th Cir. 2016) (quoting Restatement (Second) of Judgments § 27 (Am. Law Inst. 1982)).

Fofana argues that the issue of his admissibility, as it relates to his LSO membership and support for ULIMO, was "actually litigated" when the IJ granted his application for asylum.  The Government argues first that Congress did not intend for the common-law doctrine of preclusion to apply to adjustment-of-status determinations and next that preclusion rules cannot apply because of an intervening change in the rules governing admissibility.  If the Court determines that the doctrine applies, however, the Government argues that the issue of Fofana's admissibility was not actually litigated and that the issue is not the same because of an intervening change in the law governing terrorism-related grounds of inadmissibility.

## A.     Application of Preclusion to Adjustment-of-Status Determinations

The Government first argues that the text of § 1159, the adjustment-of-status statute, demonstrates congressional intent, albeit implicitly, that adjustment-of-status applications should be excluded generally from the rules of preclusion.  The Government argues in the alternative that preclusion rules cannot apply in this case because the of a change in controlling principles of law.

### 1.     *Exemption from preclusion rules*

The Supreme Court "ha[s] long favored application of the common-law doctrine[] of collateral estoppel . . . to those determinations of administrative bodies that have attained finality."  *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107–08 (1991); *see also United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966) ("When an administrative agency is acting in a judicial capacity and resolves disputed issues . . . which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply [preclusion rules] to enforce repose."); *accord Gurley v. Hunt*, 287 F.3d 728, 731 (8th Cir. 2002).  Because "Congress is understood to legislate against a background of common-law adjudicatory principles[,] . . . the courts may take is as a given that Congress has legislated with an expectation that the [rules of preclusion, including collateral estoppel] will apply 'except when a statutory purpose to the contrary is evident.'"  *Solimino*, 501 U.S. at 108 (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)).

Overcoming this presumption does not require a "clear statement, to the effect that Congress must state precisely any intention to overcome the presumption's application to a given statutory scheme."  *Id.*  In schemes where "weighty and constant values," such as

constitutional rights or international relations, are not at issue, the presumption will apply, therefore, in cases "where Congress has failed expressly or **impliedly** to evince any intention on the issue." *Id.* at 109–10 (emphasis added). Put another way, a statutory scheme may overcome the presumption that preclusion rules apply, even without a specific statement of congressional intent to do so, if the scheme (a) relates to issues other than constitutional rights or international relations, and (b) is structured in a way that implies preclusion should not apply, presumably because application of the doctrine would create absurd results.

The Government argues that because the statute governing asylum (§ 1158) is separate from the statute governing adjustment-of-status applications (§ 1159), Congress has impliedly evinced an intention not to apply preclusion rules to the latter. The Government fails to provide any authority for this contention. Nor does the Government explain why the Court should not consider that both statutes are part the larger INA, 8 U.S.C. §§ 1101–1537, and, more specifically, both are found within Subchapter II of the INA, 8 U.S.C. §§ 1151–1382, which governs immigration.

The case on which the Government relies for the general proposition that preclusion rules apply only "where Congress has failed expressly or impliedly to evince any intention on the issue," 501 U.S. 109–10, is itself instructive. In *Solimino*, the Supreme Court concluded that the findings of the New York State Division of Human Rights did not preclude the filing of an age-discrimination suit under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–34, because, like the analogous Title VII, the statute "plainly assume[d] the possibility of federal consideration after state agencies have

finished theirs . . . [and] such federal proceedings would be strictly *pro forma* if state administrative findings were given preclusive effect." *Id.* at 111. The Supreme Court concluded that it would be absurd for Congress to create an opportunity for federal review of an outcome without the ability to come to a contrary conclusion and therefore preclusion could not apply.

No similarly absurd results are to be found in this case. Indeed, § 1159 expressly relies upon grants of asylum made under § 1158, and the statutory command that an asylee's admissibility be considered "at the time of examination for adjustment," 8 U.S.C. § 1159(b)(5), clarifies that the second admissibility inquiry is substantive rather than merely a pro forma proceeding.

The Government argues, however, that the language "at the time of examination for adjustment" also evinces an implied desire by Congress to waive application of the rules of preclusion. Under this reading, preclusion must not apply because the admissibility inquiry, despite being made pursuant to an adjustment-of-status application, must consider all issues impacting admissibility rather than only those potential barriers that arose between the granting of asylum and the § 1159 application. This is a tautology and assumes the Government's premise.

Reading the statute with the presumption that Congress legislates **expecting** preclusion to apply supplies the inverse conclusion. Congress could have made LPR status automatic for asylees after one year, but it instead required that the asylee must remain a refugee, as defined by the INA, and remain admissible "at the time of examination for adjustment" because Congress wanted USCIS to investigate whether the answers to those

questions **remained** affirmative. Without the command that admissibility be considered "at the time of examination for adjustment," the asylum determination would itself be preclusive and no investigation of subsequent activity would be allowed. Because Congress did not expressly or impliedly evince an intention to abrogate the usual application of common-law preclusion rules to adjustment-of-status applications, the Court concludes those rules will apply.

### 2. Change in controlling principles of law

The Government also argues that the rules of preclusion cannot apply to cases such as Fofana's because of an intervening change in the controlling principles of law—namely, amendments to the INA found in both the USA PATRIOT ACT (the "Patriot Act"), Pub. L. 107-56, §411(a), 115 Stat. 272, 345–48 (2001) and the REAL ID Act of 2005, Pub. L. 109-13, § 103, 119 Stat. 302, 306–08 (2005).

"[C]ollateral estoppel extends only to contexts in which the controlling facts and applicable legal rules remain unchanged." *Ginters v. Frazier*, 614 F.3d 822, 826–27 (8th Cir. 2010) (quoting *Montana v. United States*, 440 U.S. 147 158 (1979)). It does not apply "when controlling principles of law have changed." *Id.; see also* Restatement (Second) of Judgments § 28(2)(b) ("[R]elitigation of the issue in a subsequent action between the parties is not precluded . . . [if] a new determination is warranted in order to take account of an intervening change in the applicable legal context . . . .").

When Fofana's asylum application was granted in April 2001, inadmissibility because an alien had "engaged in a terrorist activity," 8 U.S.C. § 1182(a)(3)(B)(i)(I) (2000), was defined as:

> [T]o commit, in an individual capacity or as a member of an organization, an act which the actor knows, or reasonably should know, affords material support to any individual, organization, or government in conducting a terrorist activity at any time, including . . . [t]he soliciting of funds or other things of value for terrorist activity or for any terrorist organization.

*Id.* § 1182(a)(3)(B)(iii)(IV) (2000).

The Patriot Act amended that definition to read:

> [I]n an individual capacity or as a member of an organization . . . to solicit funds or other things of value for . . . a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate that he did not know, and should not reasonably have known, that the solicitation would further the organization's terrorist activity.

§ 411(a)(1)(F), 115 Stat. at 346–47. In addition to moving the knowledge element from the first clause to the last, the Patriot Act amendments also defined "terrorist organization," which had been previously undefined. In the case of the subsection above, terrorist organization was defined as: "[A]n organization . . . that is a group of two or more individuals, whether organized or not"—the so-called Tier III or undeclared terrorist organization. § 411(a)(1)(G), 115 Stat. at 348. However, when creating this definition of "terrorist organization," Congress applied it only to groups that "engaged in the activities described in subclause (I), (II), or (III) of clause (iv)." *Id.* That did **not** include soliciting funds, as described in subclause (IV) of clause (iv).

The REAL ID Act added the soliciting-funds definition from "engage in terrorist activity" to the definition of "terrorist organization." § 103(c), 119 Stat. at 308. The Act also amended the definition of "engage in a terrorist activity" to add an evidentiary standard for the knowledge element:

> [I]n an individual capacity or as a member of an organization . . . to solicit funds or other things of value for . . . a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization.

§ 103(b), 119 Stat. at 307–08.

The Government argues that these amendments represent a change to the controlling principles of law in the context of terrorism-related inadmissibility and create an exception to application of collateral estoppel. This argument relies heavily on the addition of the Tier III terrorist organization; the Government claims that without that definition, Fofana's activities in support of ULIMO would not have rendered him inadmissible because, before the Patriot Act, only activities related to FTOs designated pursuant to 8 U.S.C. § 1189 could render an alien inadmissible.

This argument ignores a critical distinction in the unamended version of the statute. Although 8 U.S.C. §§ 1182(a)(3)(B)(i)(IV)–(V) (2000) made inadmissible any alien who was either a representative or member of an FTO, the statute also rendered inadmissible, because they had "engaged in a terrorist activity," aliens who had "solicit[ed] funds or other things of value . . . for **any** terrorist organization." *Id.* § 1182(a)(3)(B)(i)(I) (2000) (emphasis added). Some aliens were therefor inadmissible because they met the statutory definition of a "representative" or "member" of a group and that group had been designated as an FTO; other aliens were inadmissible because they had solicited funds for **any** terrorist organization. This would necessarily include the later-defined Tier III or undesignated organizations.

As the Fifth Circuit concluded in *Amrollah v. Napolitano*, with facts similar to those presented here, when Tom Amrollah's asylum application was granted by an IJ in 1999, the implicit-but-necessary finding that he "did not provide support to *any* 'individual' *or* 'organization' in conducting a terrorist activity has a preclusive effect against a subsequent finding that Amrollah provided material support to 'a group of two or more individuals' engaged in terrorist activity." 710 F.3d 568, 573 (5th Cir. 2013). There is no substantive difference between soliciting funds "for **any** terrorist organization" and for "a group of two or more individuals, whether organized or not, which engages in" terrorist activities.

Because the Government does not supply persuasive evidence that (1) Congress "expressly or impliedly" meant to abrogate the rules of preclusion in the context of applications for asylum and asylum-based adjustment-of-status applications; or (2) that the amendments to § 1182 made by the Patriot Act or the REAL ID Act are a change in the controlling principles of law, collateral estoppel may apply to Fofana's case, if all the elements are met.

**B.      Application of Collateral Estoppel to Fofana's Case**

Final decisions of an IJ, who is "acting is a judicial capacity and resolv[ing] disputed issues," have preclusive effect on future agency decisions by USCIS. *Utah Constr. & Mining Co.*, 384 U.S. at 422. The question is simply whether the decision satisfies the elements of collateral estoppel. *See Turner*, 815 F.3d at 1111. At issue here is whether (1) the issue of Fofana's terrorism-related inadmissibility has been "actually litigated"; and (2) whether the legal standards for determining terrorism-related inadmissibility are

"significantly different" and the issue to be considered in the second action is, therefore, not actually the same as the issue determined in the first action.

### 1.    Whether Fofana's admissibility was actually litigated

The Government argues that the issue was not actually litigated because it was not "raised, contested by the parties, submitted for the determination by the court, and determined."  18 James Wm. Moore et al., Moore's Federal Practice § 132.03(2)(a) (3d ed. 2019); *see also Janjua v. Neufeld*, 933 F.3d 1061, 1066 (9th Cir. 2019) (concluding that the issue of terrorism-related inadmissibility was not collaterally estopped because it was not "raised, contested, and submitted for determination").  Instead, consistent with *Janjua*, the Government says that Fofana is conflating the fact that the IJ must, implicitly, have **decided** the question of his admissibility with whether the parties **litigated** that question. *See Janjua*, 933 F.3d at 1066 ("Issues that are necessarily decided include all issues that must have been decided for a judgment to stand—when asylum is granted, the IJ necessarily decides that none of the grounds for inadmissibility that automatically bar relief applies—regardless of whether they were explicitly raised or contested.").

Contrary to the decision in *Janjua*, an issue that is necessary to the judgment yet not actually litigated is conceivable but unlikely.  Instead, "[m]ost of the decisions that invoke the actual litigation requirement in denying issue preclusion involve judgments that did not purport to decide the issue that was not litigated."  18 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 4419 (3d ed. 2019).

Indeed, as the Ninth Circuit has recently noted, "[i]nasmuch as an issue was necessarily decided in a prior proceeding, **it was also actually litigated**." *Cook v. Harding*,

879 F.3d 1035, 1042 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 72 (2018) (emphasis added); *see also Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1321 (9th Cir. 1992) ("When the issue for which preclusion is sought is the only rational one the factfinder could have found, then that issue is considered foreclosed, even if no explicit finding of that issue has been made."); 18 Moore's Federal Practice § 132.03(2)(d) (noting that an issue may be actually litigated by inference).

Because inadmissibility is a complete bar to an application for asylum, the IJ necessarily determined Fofana was admissible when granting his asylum application. Because the issue of inadmissibility was necessarily determined, it was actually litigated for the purposes of collateral estoppel. To conclude otherwise would allow the Government to impermissibly avoid preclusion by simply failing to discuss the issue of inadmissibility at an asylum hearing, only to subsequently revive the issue—sometimes decades later. This consideration is especially relevant in cases such as Fofana's where the Government relies solely on the record developed in the earlier proceeding.

### 2. *Whether the legal standard is now significantly different*

In order for a collateral estoppel to apply, "the issue sought to be precluded must be the same as the issue involved in the prior action." *Ginters*, 614 F.3d at 826 (quoting *Robinette v. Jones*, 476 F.3d 585, 589 (8th Cir. 2007)). However, issues of fact are not the same, and therefore not preclusive, "if the legal standards governing their resolution are significantly different." 18 Moore's Federal Practice § 132.02(h).

The Government argues that the Patriot Act and REAL ID Act amendments created significantly different legal standards for determining terrorism-related inadmissibility and

therefore Fofana does not satisfy this element of collateral estoppel. As discussed above, the amendments to the definition of terrorist organization in § 1182 relevant to this case are not "significantly different" to the point of relieving the admissibility determination from the granting of Fofana's asylum application of preclusive effect. Therefore, they are not a bar to preclusion.

The Government also points to the amendment that changed the definition of "engage in terrorist activity" from "commit[ing] . . . an act which the actor knows, or reasonably should know, affords material support to any individual, organization, or government in conducting a terrorist activity at any time, including . . . soliciting of funds . . . for any terrorist organization," 8 U.S.C. § 1182(a)(3)(B)(iii)(IV) (2000) to "solicit[ing] funds . . . for . . . a[n undeclared] terrorist organization . . . unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization." *Id.* § 1182(a)(3)(B)(iv)(IV)(cc).

The Government asserts the amended statute is "significantly different" because the unamended statute required a nexus between soliciting funds and knowledge that the solicitation "afford[ed] material support . . . in conducting a terrorist activity." This ignores the crucial term "including." The statute explicitly lists "soliciting of funds . . . for any terrorist organization" as an act which satisfies the definition of "engage in terrorist activity." The Government attempts to draw a material distinction between it and the statute as amended, but no such distinction exists. Because there is no material difference, there is no bar to collateral estoppel.

## CONCLUSION

The impact of Fofana's association with ULIMO on the question of his admissibility was decided with preclusive effect when his application for asylum was granted in 2001. Because the Government has failed to show either that than the rules of preclusion should not apply to adjustment-of-status applications generally or that the determination in Fofana's case should not be preclusive, it is collaterally estopped from finding Fofana inadmissible because of his association with ULIMO.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Plaintiff's Motion for Summary Judgment [Docket No. 23] is **GRANTED;** and

2.  Defendants' Motion for Summary Judgment [Docket No. 27] is **DENIED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  January 21, 2020          _____
at Minneapolis, Minnesota.                    JOHN R. TUNHEIM
                                                        Chief Judge
                                              United States District Court